IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-346

No. COA20-551

Filed 20 July 2021

Durham County, No. 19 SPC 2461

IN THE MATTER OF: Q.J.

Appeal by Respondent from an Order entered 17 January 2020 by Judge Pat Evans in Durham County District Court. Heard in the Court of Appeals 10 March 2021.

*Attorney General Joshua H. Stein, by Assistant Attorney General John Tillery, for the State.*

*Appellate Defender Glenn Gerding, by Assistant Appellate Defender Katy Dickinson-Shultz, for respondent-appellant.*

HAMPSON, Judge.

**Factual and Procedural Background**

¶ 1 Respondent-Appellant Q.J. (Respondent) appeals from an Involuntary Commitment Order entered in Durham County District Court declaring Respondent mentally ill, a danger to self and others, and ordering Respondent be committed to an inpatient facility for thirty days. The Record reflects the following:

On 25 December 2019, Dr. Naveen Sharma with Duke University Medical Center (Duke), signed an Affidavit and Petition for Involuntary Commitment in Durham County District Court stating Respondent was mentally ill and a danger to himself or others or "in need of treatment in order to prevent further disability or deterioration" likely to result in dangerousness.  Submitted with this Affidavit was an Examination for Involuntary Commitment report conducted by Dr. Sharma.  Dr. Sharma stated Respondent had a "history of schizoaffective disorder" and "multiple hospitalizations[.]"  Moreover, according to Dr. Sharma, Respondent presented "to the Duke emergency department with a similar presentation to previous [emergency department visits] that led to" Respondent being hospitalized in the past.

The report also stated: "Per the police officers, he was having thoughts of harming his mother, and has previously threatened to slit her throat with a knife, and also had expressed suicidal thoughts."  Dr. Sharma noted, "[Respondent] presents with disorganized behavior and manic speech[,] . . . is unable to adequately care for himself in the community, and has not been regularly taking his prescribed medicine.  As such it is my best clinical judgment that this patient will require inpatient hospitalization for stabilization and safety."

On 25 December 2019, a magistrate issued a Findings and Custody Order finding Respondent was mentally ill and a danger to himself or others, and ordering Respondent be delivered to Duke's "Williams Ward."[1]

Respondent underwent a second evaluation, conducted by Dr. Bryan Lao, at Duke's inpatient unit the next day. Dr. Lao's report stated Respondent "has a previous history of schizo-affective disorder, bipolar type . . . has been hospitalized over 30 times in the past due to the medication non-compliance . . . has a history of threatening his family[,] . . . and thoughts of hurting/killing his mother." The report also alleged Respondent "has had numerous suicide attempts in the past including . . . attempting to cut his own arm off."

On 17 January 2020, after granting two continuances, the trial court heard Respondent's case pursuant to N.C. Gen. Stat. § 122C-268. At the outset, Respondent's counsel objected to the proceedings because there was no representative for the State present. Defense counsel noted the district attorney's office believed it was not required to send a representative as did the Attorney General's office. The trial court overruled Respondent's objection and the hearing continued.

The trial court called Dr. Kristen Shirey as the only witness to testify for Duke. Respondent's counsel objected to the trial court allowing Dr. Shirey's testimony

---

[1] The Affidavit, examination report, and Findings and Custody Order were all filed on 27 December 2019.

because Dr. Shirey did not complete either of Respondent's evaluations for commitment; the trial court overruled Respondent's objection.

¶ 8     The trial court asked Dr. Shirey: "All right, ma'am. Tell me what it is you want me to know about this matter." Dr. Shirey testified Respondent was brought to Duke after expressing homicidal ideations toward his mother. Respondent had an extensive history of schizoaffective disorder and past hospitalizations. Dr. Shirey testified despite Respondent "responding well" to his medication, he "has significantly limited insight into the nature of his illness or the need for ongoing medication." In Dr. Shirey's opinion, if Respondent were released, his risk of decompensating was high, possibly resulting in suicidal or homicidal ideations or actions. Dr. Shirey also testified Respondent's "assertive community treatment" team recommended Respondent "have a longer-term hospitalization in order to achieve more stabilization . . . with [a] long-acting injectable medication." The trial court asked if Dr. Shirey had "[a]nything else" to add. Dr. Shirey did not.

¶ 9     Upon cross-examination, Respondent's counsel confirmed Dr. Shirey was not "the doctor that completed the first evaluation[.]" Dr. Shirey testified despite having histories of threatening others and of suicide attempts, Respondent had not made any such threats or suicidal ideations during this visit to Duke. When asked whether Respondent had harmed himself after being released from his earlier hospitalizations, Dr. Shirey stated: "He has harmed himself a few times, but not

others." The trial court asked: "Do you wish to explain your answer?" Dr. Shirey explained Respondent had a history of suicide attempts, including trying to cut off his own arm. The trial court asked Dr. Shirey: "I'm sorry, what was the last thing you said?" Dr. Shirey clarified: "Attempting to cut off his own arm."

Following cross-examination by Respondent's counsel, the trial court further inquired:

> Q. Doctor, is it your testimony that the Defendant is or is not a danger to himself now?
>
> A. He is a danger to himself now.
>
> Q. Is it your testimony that the Defendant is or is not a danger to others at this present time?
>
> A. He is a danger to others.
>
> Q. And how long are you asking to commit him?
>
> A. Thirty days.

Respondent's counsel called Respondent to testify. After some discussion between Respondent and the bailiff, where Respondent expressed reservations about testifying claiming to do so would be "sacrilegious," Respondent did not take the witness stand. Respondent's counsel gave closing remarks in which counsel asked the trial court to release Respondent because, although the trial court heard evidence that Respondent was a danger to himself and others in the past, Respondent had made no suicidal ideations while at Duke and none of his previous threats to others

had "come to fruition."

¶ 12        After Respondent's counsel gave her closing remarks, the trial court found Respondent was mentally ill, was a danger to himself and others, and ordered Respondent be committed for thirty days. Respondent then asked the trial court: "Can I still take the stand? Can I try again?" The trial court allowed Respondent to take the stand. Respondent testified he did not feel he was a threat to himself, to his mother, or to others. He also testified he would call 911 if he ever needed any help and that he would continue to take his medications if released. The trial court stated its ruling stood. Respondent's counsel gave oral Notice of Appeal in open court and asked that the Appellate Defender be appointed.

¶ 13        That same day, the trial court entered a written Order. The trial court found "by clear, cogent, and convincing evidence" Respondent: "suffers from s[c]hizoaffective disorder[;]" had been hospitalized thirty times; had previously exhibited homicidal ideations towards his mother; was in need of long-acting injectable medication; intended to fire his assertive community treatment team; had a history of suicide attempts, including attempting to cut off his own arm; was initially unwilling to testify because it was "sacrilegious"; and that "his speech was fast and somewhat incoherent." The trial court's Order also seemed to incorporate, as Findings of Fact, Dr. Sharma's Examination report; however, although the trial court listed the examination Dr. Sharma completed, the trial court did not check the box expressly

incorporating the report as findings of fact.[2] The trial court concluded Respondent was mentally ill and a danger to himself and others. Accordingly, the trial court ordered Respondent committed for thirty days.

## Issues

The issues on appeal are: (I) whether this Court should exercise its discretion and allow Respondent's appeal when Respondent's counsel did not file a written notice of appeal as required by our Rules of Appellate Procedure; (II) whether the trial court violated Respondent's due process right to an impartial tribunal by calling and examining a witness in order to elicit evidence, in the absence of any representative of the State; and (III) whether the trial court's underlying Findings of Fact supported its ultimate Findings Respondent was dangerous to himself and to others.

## Analysis

### I. Jurisdiction

Recognizing Respondent's trial counsel never filed a written notice of appeal, Respondent's appellate counsel has filed, concurrently with Respondent's brief, a Petition for Writ of Certiorari with this Court to allow review of the trial court's

---

[2] The trial court's Order references a 7 December 2019 report. However, the only such report related to Respondent made by Dr. Sharma occurred on 25 December 2019 and was filed on 27 December 2019.

Order.

¶ 16     Respondents in involuntary commitment actions have a statutory right to appeal a trial court's order. N.C. Gen. Stat. § 122C-272 (2019) ("Judgment of the district court [in involuntary commitment cases] is final. Appeal may be had to the Court of Appeals by the State or by any party on the record as in civil cases."). Rule 3 of our Rules of Appellate Procedure governs such appeals. N.C.R. App. P. 3(a) (2021) ("Any party entitled to appeal from a judgment or order of a superior or district court rendered in a civil action or special proceeding may take appeal by filing notice of appeal with the clerk of superior court[.]"). Rule 3 requires parties to file written notice of appeal thirty days after the entry of such a judgment or order. N.C.R. App. P. 3(a), (c) (2021). "Rule 3 is a jurisdictional rule" and " a party's compliance with Rule 3 is necessary to establish appellate jurisdiction[.]" *Am. Mech., Inc. v. Bostic*, 245 N.C. App. 133, 143, 782 S.E.2d 344, 350 (2016). "[A] jurisdictional rule violation . . . precludes the appellate court from acting in any manner other than to dismiss the appeal." *Id.* at 142, 782 S.E.2d at 350 (citation and quotation marks omitted). Thus, in the absence of a properly filed notice of appeal, this Court has no jurisdiction to consider Respondent's appeal as of right.

¶ 17     However, Rule 21 of our Rules of Appellate Procedure provides: "[t]he writ of certiorari may be issued in appropriate circumstances by either appellate court to permit review of the judgments and orders of trial tribunals when the right to

prosecute an appeal has been lost by failure to take timely action[.]" N.C.R. App. P. 21(a)(1) (2021); *see also* N.C. Gen. Stat. § 7A-32(c) (2019). Respondent concedes his counsel did not file written notice of appeal, but, because counsel objected to the proceedings and gave oral Notice of Appeal in open court, asks this Court to exercise its discretion and issue a writ of certiorari to review his case. Because Respondent's counsel objected to the proceedings and demonstrated at least the intent to appeal the trial court's order, and because involuntary commitment is a significant incursion to one's liberty interests, *Humphrey v. Cady*, 405 U.S. 504, 509, 31 L. Ed. 2d 394 (1972), we grant Respondent's Petition and review the trial court's Order.

¶ 18 Additionally, although neither party argues this case is moot because the period of commitment has expired, discharge from involuntary commitment does not render an appeal moot. "The possibility that respondent's commitment in this case might likewise form the basis for a future commitment, along with other obvious collateral legal consequences, convinces us that this appeal is not moot." *In re Moore*, 234 N.C. App. 37, 41, 758 S.E.2d 33, 36 (2014) (citation and quotation marks omitted). Accordingly, Respondent's appeal is properly before this Court.

## II. Impartial Tribunal

¶ 19 Respondent argues the trial court violated his due process right to an impartial tribunal because the State was not represented by counsel and the trial court elicited evidence in favor of committing Respondent. The due process right to an impartial

tribunal raises questions of constitutional law that we review de novo. *Dorsey v. UNC-Wilmington*, 122 N.C. App. 58, 66, 468 S.E.2d 557, 562 (1996). "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C.R. App. P. Rule 10(a)(1) (2021). Although Respondent's counsel did not expressly state an objection on constitutional grounds, it is apparent from the context Respondent objected on due process grounds as counsel objected to the nature of the proceedings where there was no counsel for the State present and where the trial court was the only entity to elicit evidence on direct examination.

¶ 20    N.C. Gen. Stat. § 122C-268 provides for how both a respondent and the State are to be represented in an involuntary commitment proceeding. N.C. Gen. Stat. § 122C-268(d) mandates a "respondent shall be represented by counsel of his choice; or if he is indigent within the meaning of G.S. 7A-450 or refuses to retain counsel if financially able to do so, he shall be represented by counsel appointed in accordance with rules adopted by the Office of Indigent Defense Services." N.C. Gen. Stat. § 122C-268(d) (2019). As to representation of the State's interests, the statute has separate provisions depending on whether the proceeding arises out of a state facility or not:

    The attorney, who is a member of the staff of the Attorney

General assigned to one of the State's facilities for the mentally
ill or the psychiatric service of the University of North Carolina
Hospitals at Chapel Hill, shall represent the State's interest at
commitment hearings, rehearings, and supplemental hearings
held for respondents admitted pursuant to this Part or G.S. 15A-
1321 at the facility to which he is assigned.

In addition, the Attorney General may, in his discretion,
designate an attorney who is a member of his staff to represent
the State's interest at any commitment hearing, rehearing, or
supplemental hearing held in a place other than at one of the
State's facilities for the mentally ill or the psychiatric service of
the University of North Carolina Hospitals at Chapel Hill.

N.C. Gen. Stat. § 122C-268(b) (2019).[3]

The State takes the position that the latter provision means the Attorney General has complete discretion whether or not to appear in involuntary commitment proceedings at non-state-owned facilities and, thus, involuntary commitment proceedings at private hospitals may proceed without the State's interests being represented, as occurred in this case. We express no opinion on the correctness of the State's statutory interpretation or as to the soundness of such practice. However, our Court has previously rejected arguments respondent's due process rights were violated in involuntary commitment proceedings where the State, as petitioner, was

---

[3] In addition: "If the respondent's custody order indicates that he was charged with a violent crime, including a crime involving an assault with a deadly weapon, and that he was found incapable of proceeding, the clerk shall give notice of the time and place of the hearing as provided in G.S. 122C-264(d). The district attorney in the county in which the respondent was found incapable of proceeding may represent the State's interest at the hearing." N.C. Gen. Stat. § 122C-268(c) (2019).

not represented by counsel and where:

> [t]he gravamen of [respondent's] contention is (1) that he was
> denied a fair hearing because, due to absence of counsel for
> petitioner, the court acted as petitioner's de facto counsel; and (2)
> that he was denied equal protection of the law because petitioners
> in hearings at state regional psychiatric facilities are represented
> by counsel, G.S. 122-58.7(b), -58.24, while petitioners in hearings
> held elsewhere are not.

*In re Perkins*, 60 N.C. App. 592, 594, 299 S.E.2d 675, 677 (1983). There, this Court

noted: "We are aware of no *per se* constitutional right to opposing counsel. Nothing

in the record indicates language or conduct by the court which conceivably could be

construed as advocacy in relation to petitioner or as adversarial in relation to

respondent." *Id.* We reached the same conclusion in a companion case filed the same

day as *Perkins*, rejecting the argument "it is unconstitutional to allow the trial judge

to preside at an involuntary commitment hearing and also question witnesses at the

same proceeding." *In re Jackson*, 60 N.C. App. 581, 584, 299 S.E.2d 677, 679 (1983).

Therefore, because our Court has previously upheld involuntary commitments where

the State has not appeared and where the trial court has questioned witnesses and

elicited evidence, we are bound by our prior precedent to conclude the same. *See In

re Civil Penalty*, 324 N.C. 373, 384, 379 S.E.2d 30, 37 (1989) ("Where a panel of the

Court of Appeals has decided the same issue, albeit in a different case, a subsequent

panel of the same court is bound by that precedent, unless it has been overturned by

a higher court.").

¶ 22        Moreover, "[j]udges do not preside over the courts as moderators, but as essential and active factors or agencies in the due and orderly administration of justice. It is entirely proper, and sometimes necessary, that they ask questions of a witness[.]" *State v. Hunt*, 297 N.C. 258, 263, 254 S.E.2d 591, 596 (1979) (citation and quotation marks omitted). However, trial courts must be careful to avoid prejudice to the parties and may not impeach a witness's credibility. *State v. Howard*, 15 N.C. App. 148, 150-51, 189 S.E.2d 515, 517 (1972) (citation omitted).

¶ 23        In this case, as in *Perkins*, nothing in the Record indicates language or conduct that could be construed as advocacy for or against either petitioner or Respondent. Here, the trial court called Dr. Shirey to testify. The trial court's only questions of Dr. Shirey on direct examination were: "All right, ma'am. Tell me what it is you want me to know about this matter[;]" "Anything else?"; and "I'm sorry. What was the last thing you said?" On redirect, the trial court only asked Dr. Shirey if her testimony was that Respondent was a danger to himself and to others, and how long Duke was requesting Respondent be committed. Moreover, after Respondent initially declined to testify, and after the trial court had already issued its ruling, the trial court permitted Respondent to testify on his behalf. During Respondent's testimony, the trial court only asked, "[y]ou wanted to tell me what?" when clarifying Respondent's previous statement. The trial court merely elicited evidence that would otherwise be overlooked as no counsel for the State was present. The trial court did not ask

questions meant to prejudice either party or impeach any witness and afforded Respondent the opportunity to testify on his behalf even after the close of all the evidence. Accordingly, the trial court did not violate Respondent's right to an impartial tribunal.

## III. Findings of Fact

Respondent also argues the trial court's underlying Findings were insufficient to support its ultimate Findings Respondent was a danger to himself and to others. "To support an inpatient commitment order, the court shall find by clear, cogent, and convincing evidence that the respondent is mentally ill and dangerous to self, . . . or dangerous to others . . . ." N.C. Gen. Stat. § 122C-268(j) (2019). Our General Statutes define dangerous to self and others as:

> a. Dangerous to self.—Within the relevant past, the individual has done any of the following:
>
> 1. The individual has acted in such a way as to show all of the following:
>
> I. The individual would be unable, without care, supervision, and the continued assistance of others not otherwise available, to exercise self-control, judgment, and discretion in the conduct of the individual's daily responsibilities and social relations, or to satisfy the individual's need for nourishment, personal or medical care, shelter, or self-protection and safety.
>
> II. There is a reasonable probability of the individual's suffering serious physical debilitation within the near future unless adequate treatment is given pursuant to this Chapter. A showing of behavior that is grossly irrational, of actions that

the individual is unable to control, of behavior that is grossly inappropriate to the situation, or of other evidence of severely impaired insight and judgment shall create a prima facie inference that the individual is unable to care for himself or herself.

2. The individual has attempted suicide or threatened suicide and that there is a reasonable probability of suicide unless adequate treatment is given pursuant to this Chapter.

3. The individual has mutilated himself or herself or has attempted to mutilate himself or herself and that there is a reasonable probability of serious self-mutilation unless adequate treatment is given pursuant to this Chapter.

Previous episodes of dangerousness to self, when applicable, may be considered when determining reasonable probability of physical debilitation, suicide, or self-mutilation.

b. Dangerous to others.—Within the relevant past, the individual has inflicted or attempted to inflict or threatened to inflict serious bodily harm on another, or has acted in such a way as to create a substantial risk of serious bodily harm to another, or has engaged in extreme destruction of property; and that there is a reasonable probability that this conduct will be repeated. Previous episodes of dangerousness to others, when applicable, may be considered when determining reasonable probability of future dangerous conduct. Clear, cogent, and convincing evidence that an individual has committed a homicide in the relevant past is prima facie evidence of dangerousness to others.

N.C. Gen. Stat. § 122C-3(11) (2019).

¶ 25    Thus, the trial court must satisfy two prongs when finding a respondent is a danger to self or others on any of the bases above: "A trial court's involuntary commitment of a person cannot be based solely on findings of the individual's 'history

of mental illness or . . . behavior prior to and leading up to the commitment hearing,' but must [also] include findings of 'a reasonable probability' of some future harm absent treatment[.]" *In re J.P.S.*, 264 N.C. App. 58, 62, 823 S.E.2d 917, 921 (2019) (citing *In re Whatley*, 224 N.C. App. 267, 273, 736 S.E.2d 527, 531 (2012)). "Although the trial court need not say the magic words 'reasonable probability of future harm,' it must draw a nexus between past conduct and future danger." *Id.* at 63, 823 S.E.2d at 921.

¶ 26     It is the role of the trial court to determine whether the evidence of a respondent's mental illness and danger to self or others rises to the level of clear, cogent, and convincing. *Whatley*, 224 N.C. App. at 270-71, 736 S.E.2d at 530 (citation omitted). "Findings of mental illness and dangerousness to self are ultimate findings of fact." *In re B.S.*, 270 N.C. App. 414, 417, 840 S.E.2d 308, 310 (2020) (citing *In re Collins*, 49 N.C. App. 243, 246, 271 S.E.2d 72, 74 (1980)). On appeal, "[t]his Court reviews an involuntary commitment order to determine whether the ultimate findings of fact are supported by the trial court's underlying findings of fact and whether those underlying findings, in turn, are supported by competent evidence." *B.S.*, 270 N.C. App. at 417, 840 S.E.2d at 310 (citing *In re W.R.D.*, 248 N.C. App. 512, 515, 790 S.E.2d 344, 347 (2016)). As such, the trial court must also record the facts that support its "ultimate findings[.]" *Whatley*, 224 N.C. App. at 271, 736 S.E.2d at 530. "If a respondent does not challenge a finding of fact, however, it is presumed to

be supported by competent evidence and [is] binding on appeal." *Moore*, 234 N.C. App. at 43, 758 S.E.2d at 37 (citation and quotation marks omitted).

¶ 27    Respondent does not challenge the trial court's ultimate Finding he was mentally ill. Although Respondent challenges the trial court's ultimate Findings he was a danger to himself and others, Respondent only challenges the trial court's underlying Findings Respondent was unable to care for himself in the community, was not taking his medications, and that the trial court did not indicate how recently Respondent attempted suicide. Thus, the rest of the trial court's Findings are presumed to be supported by competent evidence. *Id.*

### A. Danger to Self

¶ 28    Respondent argues there is insufficient evidence to support the Finding Respondent was a danger to himself absent the challenged underlying Findings, and that the trial court did not expressly find a reasonable probability Respondent would harm himself in the future.

¶ 29    The trial court found Respondent was a danger to himself because Respondent: suffered from schizoaffective disorder; had been hospitalized thirty times; had a history of suicidal ideations; and exhibited speech that was "fast and somewhat

incoherent." The trial court, by incorporating Dr. Sharma's report, [4] received evidence police brought Respondent to Duke in this instance, in part, because of suicidal ideations. Therefore, competent evidence supports the underlying Finding Respondent had a history of suicidal ideations in the relevant past. As such, the trial court satisfied the first prong by finding Respondent had a history, including a recent history, of suicidal ideations.

¶ 30        Although the trial court did not expressly state Respondent had a reasonable probability of decompensating and harming himself, the trial court did find Respondent: needed a long-acting, injectable medication that Respondent had not yet received; intended to fire his "assertive management team"; and—by incorporating Dr. Sharma's report—presented in the same manner as when he had been hospitalized in the past and needed inpatient treatment for "stabilization and safety." Therefore, the trial court's Findings " 'indicate that Respondent's illness or any of [his] aforementioned symptoms will persist and endanger [him] within the near future.' " *J.P.S.*, 264 N.C. App. at 63, 823 S.E.2d at 921 (quoting *Whatley*, 224 N.C.

---

[4] Although the trial court did not check the box on the pre-printed form expressly incorporating Dr. Sharma's report, the trial court entered a date and Dr. Sharma's name in the spaces provided on the form that would list a report so incorporated. Because the trial court evidenced its intent to incorporate the specific report by listing the report, we conclude the trial court inadvertently failed to check the box expressly incorporating the report as findings of fact. *Cf. Rudder v. Rudder*, 234 N.C. App. 173, 181, 759 S.E.2d 321, 327 (2014) (holding the trial court satisfied the requirement it find there was a danger of domestic violence when it checked boxes related to specific findings under the box expressly finding a danger of domestic violence, but not that box itself). Moreover, Respondent concedes Dr. Sharma's "report was incorporated by reference."

App. at 273, 736 S.E.2d at 531).  Thus, these Findings also support the trial court's ultimate Finding Respondent was a danger to self.

### B. Danger to Others

¶ 31        Respondent also challenges the trial court's ultimate Finding he was a danger to others because, according to Respondent, the trial court did not find a reasonable probability of future harm.  However, as described above, trial court satisfied its requirement to find a reasonable probability of future harm because the trial court found: Respondent's last hospitalization was directly related to his homicidal ideations directed toward his mother; Respondent presented to Duke, in this instance, in a similar manner as he had when previously committed; needed long-acting, injectable medicine; planned to fire his management team; and required hospitalization for "stabilization and safety."  All of these Findings indicate a risk of future harm absent commitment.  Thus, the trial court properly found there was a reasonable probability of future harm and that Respondent was a danger to others.

¶ 32        The trial court only needed to find Respondent was a danger to himself *or* to others in conjunction with finding he was mentally ill.  Because the trial court's underlying Findings supported its ultimate Findings Respondent was both a danger to himself *and* to others, the trial court supported its Order committing Respondent. N.C. Gen. Stat. § 122C-268(j) (2019).

## Conclusion

For the foregoing reasons, we affirm the trial court's Order.

AFFIRMED.

Judge DILLON concurs in a separate opinion.

Judge GRIFFIN dissents in a separate opinion.

No. COA20 – 551 *In re: Q.J.*

DILLON, Judge, concurring.

I fully concur in the majority opinion and its reasoning. I write separately to expound the due process issue based on the trial court calling and questioning witnesses where the State was not present at the hearing. Specifically, I note the points I make in the "Due Process Concerns" section of my concurring opinion in the companion appeal, *In re C.G.*, ___ N.C. App. ___, 2021-NCCOA-344.

No. COA20-551 – *In re Q.J., Jr.*

GRIFFIN, Judge, dissenting.

I dissent from the majority opinion for the reasons stated in my dissenting opinion in *In re C.G.*, ___ N.C. App. ___, 2021-NCCOA-344, a companion case heard by this panel on 10 March 2021.